# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **JOHN FENTON WHEELER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 02-0604 (RMC)** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **JUSTICE, *et al.*[1]** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION

In this suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the

Privacy Act ("PA"), 5 U.S.C. § 552a, John Fenton Wheeler challenges the adequacy of the response

of the Federal Bureau of Investigation ("FBI") to his FOIA request. Mr. Wheeler responds to the

Government's motion for summary judgment with a cross motion for summary judgment. The Court

will grant the Government's motion in part and deny it in part, and deny Mr. Wheeler's motion as

moot.

## I. BACKGROUND

John Fenton Wheeler is a retired journalist who had extensive experience reporting

from Spanish-speaking countries. He is contemplating writing a book about his career. Declaration

of Christine Kiefer, Sept. 12, 2002 ("1st Kiefer Decl."), Ex. A (Wheeler FOIA Request). Mr.

---

[1] The Central Intelligence Agency ("CIA") was initially the first-named defendant in this suit. By memorandum opinion dated June 4, 2003, the Court dismissed the FOIA complaint against the CIA. *Wheeler v. CIA*, No. 02-0604 (RMC), Memorandum Opinion (D.D.C. June 4, 2003). The parallel allegations against the FBI were finally briefed in full on June 5, 2005, and are now ready for decision.

Wheeler served as the correspondent in Cuba for the Associated Press ("AP") from February 13, 1967 until September 8, 1969.  On that date, he was expelled by order of the Cuban government, and he and his wife were escorted aboard a Cuban plane to Mexico City.  Humberto Carillo, press aide at the Mexican embassy in Havana, was also aboard the plane; Mr. Carillo had been formally accused by the Cuban government of being a spy for the United States Central Intelligence Agency ("CIA").  Mr. Wheeler was told that his expulsion was based upon his news stories concerning Mr. Carillo and on the Cuban government's accusation that he, too, was a CIA spy.

Mr. Wheeler traveled from Mexico City to Houston, where he talked by telephone with the late Wes Gallagher, the AP's president and general manager.  Mr. Gallagher advised that both the FBI and the CIA wanted to talk with Mr. Wheeler but Mr. Wheeler stated that he had no interest in talking with either agency.

Thereafter, in February 1971, a Cuban defector, Francisco Antonio Teira Alfonso, testified to the U.S. Senate Judiciary Committee's Subcommittee on Internal Security that Castro had been very interested in proving that Mr. Wheeler had been a CIA agent or had been co-opted by the CIA.  Mr. Alfonso had worked for the Cuban Directorate of State Security at the time and testified that he had been ordered by a superior to frame Mr. Wheeler.

Mr. Wheeler submitted a FOIA/PA request to the FBI by letter dated June 18, 2001, seeking records concerning himself.  Specifically, he requested that the FBI:

1.   [S]earch the General Indices to [the] Central Records System for all main files and "see" references.

2.   [S]earch the ELSUR indices and any appropriate indices maintained by any division, section or other component of the FBI.

3.   [Search for] ticklers, numbered and lettered subfiles, 1A envelopes, enclosures

behind files ("EBFs"), file covers, Bulky Exhibits ("Bulkies"), control files, "JUNE" records or files.  Mr. Wheeler want[ed] all records produced with the administrative markings and all reports to include the administrative pages.  He want[ed] all pages released regardless of the extent of excising, even if all that remains are the date, stationary [sic] headings or administrative markings.

4.      [S]earch [the] subfiles on Cuba (from February 1967 to September 1969), Spain and Portugal (from November 1969 to September 1982), and Peru (from September 1982 to 1985).

5.      Mr. Wheeler also [sought]: (a) the worksheets or other documents generated in processing which list or inventory the records; and (b) all searchslips [sic] or other records used in searching this request.

1st Kiefer Decl., Ex. A at 1-2.  By letter dated September 29, 2001, the FBI informed Mr. Wheeler

that his request had been received by FBI Headquarters ("FBIHQ") and, on May 7, 2002, it denied

his request for a fee waiver.  *Id*. at 2.  Thereafter, on August 8, 2002, the FBI processed the

documents identified below and released the non-exempt documents to Mr. Wheeler.  *Id.*

FBIHQ searched the indices of the FBI Central Records System ("CRS") for

responsive records.[2]  The FBI also searched its Electronic Surveillance Indices ("ELSUR"), through

---

[2]   The CRS consists of a numerical sequence of files broken down according to subject matter, relating to an individual, organization, company, publication, activity, or intelligence matter.  Access to the CSR is through its General Indices, which are also arranged in alphabetical order and include the names of individuals and organizations.  "These indices to the CRS are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter."  Second Declaration of Carol L. Keeley, Sept. 12, 2003 ("2nd Keeley Decl.") at ¶ 14.

An index reference falls into two general categories: (1) a "main" index reference; and (2) a "cross-reference" index reference.  *Id.* ¶ 11.  A main index reference carries the name of the individual, organization, activity or the like, which is the main subject of file maintained in the system. *Id.*  A cross reference index reference contains only a mention of or reference to an individual or organization which is located in the body of a communication in a file concerning the investigation of another individual or event.  *Id.*

which the FBI maintains information on all subjects whose electronic and/or voice communications have been intercepted by the FBI since January 1, 1960.[3] As a result of the CRS search, three main files, 105-HQ-165399, 105-HQ-203884, and 105-HQ-241850, were located. *Id.* ¶ 5. The ELSUR indices were searched by use of Mr. Wheeler's full name, "John Fenton Wheeler," and by his date of birth, place of birth and social security number. No records were located as a result of the ELSUR search. *Id.*

The FBI reviewed a total of 56 pages located as a result of the CRS search. *Id.* at ¶ 5 n.3. Five of these were duplicates and 51 pages were processed. *Id.* Information was withheld in reliance on PA Exemption (j)(2) and FOIA Exemptions (b)(1), (b)(2), (b)(7)(C), and (b)(7)(D).[4] In addition, at the request of a First [non-FBI] Government Agency, the FBI also withheld, in full, classified information in certain documents, in reliance on FOIA Exemption (b)(1).

---

Memorandum of Points and Authorities in Support of Defendant United States Department of Justice's Motion for Summary Judgment ("Def.'s Mot.") at 8 (citing Second Keeley Decl. at ¶ 11).

[3] The ELSUR indices are a separate system of records from the CRS. Second Keeley Decl. ¶ 16.

> These indices include individuals who were the (1) targets of direct surveillance, (2) participants in monitored conversations, or (3) owners, lessors, licensors of the premises where the FBI conducted electronic surveillance. In addition [to] the names of individuals in these categories, the cards in the ELSUR index contain the date the voice was monitored, a source number to identify the individual on whom the surveillance was installed, and the location of the FBI field office that conducted the monitoring.

Def.'s Mot. at 9. Field offices report to FBIHQ, for inclusion in the ELSUR index, the names of all persons whose voices have been monitored through an FBI surveillance technique. Second Keeley Decl. ¶ 16.

[4] The FBI also referenced FOIA Exemption (b)(3) when it responded to Mr. Wheeler but does not rely on that exemption before the Court. *Id.*

Mr. Wheeler then requested a search for cross references in which thirteen (13) cross references appeared to be responsive to his request.  Eleven of these cross references were reviewed and it was determined that they contained information concerning him.  The FBI is withholding in full, on the basis of FOIA Exemption (b)(1), classified information in certain of these cross-references originating with or referring to other agencies at the requests of a First and a Second Government Agency, *i.e.*, WHEELER pages 66, 76, 77; and WHEELER pages 52-53 respectively. *Id.*  Of the two remaining cross references, one contains no identifying information (date of birth, social security number) to identify the document as relating to Mr. Wheeler and the second was destroyed in 1974.  A total of twenty-three (23) pages of cross references were released to Mr. Wheeler.[5]  The FBI relied on PA Exemption (j)(2) and FOIA Exemptions (b)(1), (b)(2), (b)(7)(C), and (b)(7)(D).

Dissatisfied with this response, Mr. Wheeler filed suit on March 29, 2002.

The FBI filed a public version of its motion for summary judgment on July 14, 2004. It has also filed an *ex parte/in camera* version of the brief, with accompanying materials to explain further the bases for withholding certain documents by the First and Second Government Agencies. Having reviewed these materials in detail, the Court will order that the claims against the FBI for records referred by the First and Second Government Agencies are now resolved, withholding the documents was appropriate under FOIA Exemption (b)(1), 5 U.S.C. § 552(b)(1), and those claims will be dismissed with prejudice.

---

[5]  The FBI reports that Mr. Wheeler has notified it that WHEELER pages 54-61, which were released to Mr. Wheeler, pertain to a different John Fenton Wheeler who was also an Associated Press reporter during the same time period as Plaintiff Wheeler.  "[C]ross-references reflected in WHEELER pages 54-61 were identified in good faith as related to plaintiff and as responsive to plaintiff's FOIA request."  2nd Keeley Decl. ¶ 79.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is the routine vehicle by which most FOIA actions are resolved where there are no material facts genuinely at issue.  *See Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 314-15 (D.C. Cir. 1988); *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). FOIA requires agencies of the federal government to release records to the public upon request, unless one of nine statutory exemptions applies.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975).  "Disclosure, not secrecy, is the dominant purpose of the Act."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976); *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

"In a suit brought to compel production [of records], an agency is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from [FOIA's] inspection requirements.'"  *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  A district court conducts a *de novo* review of an agency's determination to withhold information under FOIA or the PA.  *See* 5 U.S.C. § 552(a)(4)(B); 5 U.S.C. § 552a (g)(3)(A).  The agency bears the burden of sustaining its decision to claim an exemption from disclosure.  *Id.*

"Summary judgment is warranted on the basis of agency affidavits when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Miller v. Casey*, 730 F.2d 773,

776 (D.C. Cir. 1984) (quoting *Military Audit Project*, 656 F.2d at 738).  The court is to "accord

substantial weight to an agency's affidavit concerning the details of the classified status of the

disputed record." *Military Audit Project*, 656 F.2d at 738 (quoting S. REP. No. 93-1200, 93rd Cong.

(2nd Sess. 1974), *reprinted in* 1974 U.S.C.C.A.N. 6290), and should remain "[m]indful that [it has]

little expertise in either international diplomacy or counterintelligence operations, [and thus is] in

no position to dismiss the [government's] facially reasonable concerns."  *Frugone v. CIA*, 169 F.3d

772, 775 (D.C. Cir. 1999).

### B.  FOIA and PA Exemptions

#### 1.  FOIA Exemption 1

Classified information that has been properly designated as secret is exempt from

disclosure under FOIA Exemption 1, 5 U.S.C. § 552(b)(1).  This exemption protects information that

is "specifically authorized under criteria established by an Executive order to be kept secret in the

interest of national defense or foreign policy and . . . [is] in fact properly classified pursuant to such

Executive order[.]"  *Id.*  Sections 1.5(c) and 1.5(d) of Executive Order ("E.O.") 12,958 authorize the

classification of information that concerns intelligence activities, sources, methods, or foreign

relations.  *See* Exec. Order No. 12,958, 60 Fed. Reg 19, 825 (April 17, 1995).  Pursuant to section

1.2(a)(4) of the E.O.,  information in these categories may be classified when the appropriate original

classification authority determines that unauthorized disclosure reasonably could be expected to

cause damage to national security in a manner that the classification authority is able to identify and

describe.[6]  When, as in this case, information is more than 25 years old, it must be exempt from

---

[6]  Carol L. Keeley, Assistant Section Chief of the Record/Information Dissemination
Section ("RIDS"), Records Management Division ("RMD") at FBIHQ states that she has been
"designated by the Attorney General of the United States as an original Top Secret classification

automatic declassification under one or more of the categories listed in Section 3.4(b) of E.O. 12,958.

Information that could be expected to cause damage to national security[7] is marked "Confidential" and information that could be expected to cause serious damage to national security is marked "Secret."  2nd Keeley Decl. ¶ 32.  Ms. Keeley first determined that the documents in question were initially classified properly and so marked.  These classification determinations were subsequently reviewed by the Department of Justice's ("DOJ") Department Review Committee ("DRC"), which concurred.  *Id.* ¶ 33.

Upon this review, however, Ms. Keeley determined that portions of the information contained in responsive documents no longer warranted classification; she declassified and released those portions unless they were exempt under a different FOIA Exemption.  *Id.* ¶ 34.  Further analysis of the information was performed in connection with the submission of the FBI's *Vaughn*[8] index and additional portions of the responsive documents were declassified and released to Mr.

---

authority and a declassification authority pursuant to E.O., 12,958, as amended, §§ 1.4 and 3.2." 2nd Keeley Decl. ¶¶ 1 & 4.

[7] "National security" as defined in section 6.1(y) of E.O. 12,958, as amended, "means the national defense or foreign relations of the United States."

[8] The government may satisfy its burden of justifying non-disclosure through the submission of agency declarations of sufficient detail to describe the withheld material with reasonable specificity and the reasons for non-disclosure.  *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 753 (1989).  This degree of particularity is usually supplied by a *Vaughn* index, named for *Vaughn v. Rosen*, 484 F.2d 820, 823-25 (D.C. Cir. 1973), *cert denied*, 415 U.S. 977 (1974) (noting that the agency must "specify in detail which portions of the document are disclosable and which are allegedly exempt.").

Wheeler.[9]

However, portions of the records at issue, all of which are over 25 years old, were determined to warrant continued classification and withholding from release.  Such information is contained on pages 3, 5, 6, 15-17, 19, 25, 30, 33, 49, 51, 52, 62-65, 67, 69, 71, 74, and 75.  *Id.* ¶ 36. The FBI determined that:

> [T]hese pages are exempt from automatic declassification pursuant to E.O. 12,958, as amended, §§ 3.3(b)(1) and (6), as the release of which could be expected to: (1) reveal the identity of a confidential human source, or a human intelligence source, or reveal information about the application of an intelligence source or method; and (6) reveal information, including foreign government information, that would seriously and demonstrably impair relations between the United States and a foreign government, or seriously and demonstrably undermine ongoing diplomatic activities of the United States. . . . [T]he national security information withheld is neither vulnerable to, nor has been desensitized by, the passage of time.  The foreign relations matters remain delicate and sensitive and the revelation of source information will have a negative impact on the FBI's ability to continuously recruit sources for current and future use.

2nd Keeley Decl. ¶¶ 36, 37.

2.  PA Exemption (j)(1)

Exemption (j)(1) of the Privacy Act, upon which the FBI also relies to withhold certain information, authorizes the head of an agency to promulgate rules to exempt:

> records maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals, and the activities of prosecutors, courts, correctional, probation, pardon, or parole authorities, and which consists of . . . (B) information compiled for the purpose of a criminal investigation, including reports of informants and investigators, and associated with an identifiable individual; or (C) reports identifiable to an individual compiled at any stage

---

[9]  Certain information in pages 3, 5, 15, 17, 19, 21, 26, 35, 66, 68, 70 and 72 were declassified and released.  2nd Keeley Decl. ¶ 35 & n. 15; *see also id.,* Ex. B.

of the process of enforcement of the criminal laws from arrest or indictment
through release from supervision.

5 U.S.C. § 552a (j)(2).  The investigatory records at issue here are part of the CRS and involve

national security investigations of Mr. Wheeler's activities conducted in accordance with 18 U.S.C.

§ 951 and E.O. 12,333 and its successor orders.  2nd Keeley Decl. ¶ 28.  Access to the records

concerning Mr. Wheeler were denied under the PA but nonetheless processed under the access

provisions of FOIA.  *Id.*

### 3. FOIA Exemption 2

Records that are "related solely to the internal personnel rules and practices of an

agency" are exempt from disclosure by FOIA Exemption 2, 5 U.S.C. § 552(b)(2).  This exemption

covers internal agency matters so routine or insignificant that they could not be "subject to . . . a

genuine and significant public interest," as well as internal agency matters that could be of public

interest but disclosure of which "may risk circumvention" of statutes or agency regulations.  *Rose*,

425 U.S. at 369-70; *National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525,

528-30 (D.C. Cir. 1986); *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051 (D.C.

Cir. 1981).  In the arcane world of FOIA, these are referred to "low (b)(2)" and "high (b)(2)"

exemptions.

Low (b)(2) information refers to internal procedures and practices where the burden

of disclosure would outweigh any genuine public benefit.  *Martin v. Lauer*, 686 F.2d 24, 34 (D.C.

Cir. 1982).  Protection from disclosure exists for information that qualifies as a personnel rule or

internal practice of an agency.  *Schwaner v. Dep't of the Air Force*, 898 F. 2d 793, 395 (D.C. Cir.

1990).  High (b)(2) exempts more substantive internal matters, such as techniques and procedures

for law enforcement investigations or prosecutions, *Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992), and information that would risk circumvention of an agency statute or impede its law enforcement activities. *See Crooker*, 670 F.2d at 1051.

The FBI relied on "high (b)(2)" in withholding two kinds of information: one source symbol number and two informant file numbers assigned to confidential sources. 2nd Keeley Decl. ¶ 60. "Both source symbol numbers and informant file numbers are unique identifiers for a source . . . . Source symbol numbers are assigned to confidential sources who report information to the FBI on a regular basis pursuant to an 'express' grant of confidentiality." *Id.* It is used in all documents in lieu of the source's name to protect identities. *Id.* The source symbol number is comprised of a two-letter abbreviation – which identifies the relevant FBI field office – and a sequential number. *Id.* The informant file number "consists of a three-number classification which is assigned according to the nature of the information normally provided by the source. The second part of the file consists of a case number, which is a sequentially assigned number unique to only one source of a particular FBI field office." *Id.* ¶ 65.

Portions of the responsive information were also withheld pursuant to a "low (b)(2)" exemption. The FBI refused to release "specific administrative information concerning the distribution of copies of documents to a first government agency that has requested not to be named." Def.'s Mot. at 19 (citing 2nd Keeley Decl. ¶ 66). This exemption was applied to pages 3, 8, 24, 33, 68 and 74.

4.   FOIA Exemption (7)(C)

FOIA exempts from disclosure "records or information compiled for law enforcement purposes . . . [to the extent production] (C) could reasonably be expected to constitute an

unwarranted invasion of personal privacy . . . ." 5 U.S.C. § 552(b)(7).  This exemption protects the identities of suspects and other persons who are investigated and are identified in agency records in connection with law enforcement activities.  *Computer Prof'ls for Social Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996); *Reporters Comm. for Freedom of the Press v. U.S. Dep't of Justice*, 816 F.2d 730, 780 (D.C. Cir. 1987), *modified on other grounds*, 831 F.2d 1124 (D.C. Cir. 1987), *rev'd on other grounds*, 489 U.S. 749 (1989).  The names of law enforcement officers who work on criminal investigations may be protected by Exemption 7(C), *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1281 (D.C. Cir. 1992), as may the identities of persons who provide information to law enforcement officers. *Computer Prof'ls for Social Responsibility*, 72 F.3d at 904; *Farese v. U.S. Dep't of Justice*, 683 F. Supp. 273, 275 (D.D.C. 1987).

      Once a privacy interest has been established, it must be balanced against the public interest to be served by disclosure.  *Albuquerque Publ'g Co. v. Dep't of Justice*, 726 F. Supp. 851, 855 (D.D.C. 1989).  The fundamental purpose of FOIA is to allow citizens to know "what their government is up to." *Fitzgibbon v. CIA*, 911 F.2d 755, 768 (D.C. Cir. 1990) (quotations omitted); *see Reporters Comm. for Freedom of the Press*, 489 U.S. at 773 (FOIA's "core purpose" is to "shed light on an agency's performance of its statutory duties").  Given this purpose, the D.C. Circuit has opined that there "is no reasonably conceivable way in which the release of one individual's name . . . would allow citizens to know what their government is up to." *Fitzgibbon*, 911 F.2d at 768 (quotations omitted).  Only if a requester can demonstrate a public interest that is significant and compelling might s/he overcome legitimate privacy interests.  *Senate of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 588 (D.C. Cir. 1987); *Stone v. FBI*, 727 F. Supp. 662, 667-69 (D.D.C. 1990).

      Relying upon Exemption 7(C), the FBI withheld names and/or identifying data of FBI

Special Agents and support personnel;[10] names and/or identifying information concerning third-party individuals who were of investigative interest;[11] names and/or identifying information concerning third-party individuals who were merely mentioned;[12] and the name of an individual who was interviewed by the FBI regarding a person other than Mr. Wheeler.  *See* 2nd Keeley Decl. ¶¶ 68, 69, 70, 71 & 72; *id.,* Ex. B. at 76.

5.   FOIA Exemption 7(D)

At 5 U.S.C. § 552(b)(7)(D), FOIA allows an agency to refuse to release:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source . . . .

The FBI relied on FOIA Exemption 7(D) to withhold information provided by, as well as the identities of, FBI sources.  2nd Keeley Decl. ¶ 74.  Specifically, the FBI has withheld one source symbol number and two informant file numbers.  *Id.* ¶¶ 75 – 78.

### III.  ANALYSIS

Mr. Wheeler remains dissatisfied with the scope of the FBI's search for records and its conclusions that some of these documents could have a present bearing on the national security of the United States.  With few exceptions, the Court finds that his arguments lack merit.

---

[10]   2nd Keeley Decl., Ex. B at 1, 2, 13, 21, 43, 48, 50, 66, and 74.

[11]   *Id.* at 2-13, 15, 22, 33, 35, 66, 68, 70-72, 76, and 79.

[12]   *Id.* at 1, 9, 10, and 11.

## A. Scope of Search

The immensity of the task of responding to the thousands of FOIA requests submitted to the government on a daily basis requires a rule of reason: the issue is not whether documents might (or do) exist that are responsive to a request but rather whether the search conducted by the agency was "adequate," *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis omitted), under a general standard of "reasonableness." *Oglesby v. Dep't of the Army*, 920 F.2d 57, 67 n.13 (D.C. Cir. 1990). "[A] search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986).

> It is elementary that an agency responding to a FOIA request must conduct[]
> a search reasonably calculated to uncover all relevant documents,' and, if
> challenged, must demonstrate beyond material doubt that the search was
> reasonable. . . . The adequacy of an agency's search is measured by a
> standard of reasonableness, and is dependent upon the circumstances of the
> case.'"

*Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (quotations omitted).

Mr. Wheeler challenges the adequacy of the search for documents responsive to his request on two bases. First, he argues that the search was clearly inadequate because the FBI searched only under his full name of "John Fenton Wheeler" and not on any of its natural variants, such as "John F. Wheeler" and "John Wheeler." Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Mot.") at 5. Second, his request asked that the FBI also search its "109 files on Cuba (from February 1967 to September 1969), Spain and Portugal (from November 1969 to September 1982), and Peru (from September 1982 to 1985)." *Id.* (citing Compl., Ex. 1). He asserts that there is no indication supported by declaration that any such search was conducted.

-14-

As to the first of these objections, the record indicates that the FBI's search was sufficiently broad to locate and identify documents that referred to "John Fenton Wheeler," *see* WHEELER-40-FBIHQ, "Fenton Wheeler," *see* WHEELER-74-FBIHQ, WHEELER-78-FBIHQ., and "John Wheeler," *see* WHEELER-51-FBIHQ.  The Court finds that the FBI conducted an adequate search for records concerning Mr. Wheeler.  A search "need only be reasonable; it does not have to be exhaustive." *Miller v. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985) (citing *Nat'l Cable Television Ass'n v. FCC*, 479 F. 2d 183, 186 (D.C. Cir. 1973)).

The record is unclear as to whether the FBI searched its 109 files for Cuba, Spain, Portugal, and Peru for the requested time periods.  On the one hand, the FBI states that its search for cross references satisfied this request.  However, it specifically relies on the Second Declaration of Christine Kiefer as support for the statement that "[t]he search for cross references included a search for the '109' files."  Reply in Further Support of Defendants' Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply") at 3.  The Court can find no second declaration of Christine Kiefer in the record and cannot find in Ms. Keeley's two declarations specific reference to any "109" files.  It may well be that the search for cross references fulfilled this part of Mr. Wheeler's FOIA request but it cannot be said with any certainty that that is so.  On this point, the Court will deny the FBI's motion for summary judgment without prejudice.

In addition, Mr. Wheeler asserts that the FBI production of records was inadequate because the FBI did not release its search worksheets, as specifically requested in his FOIA request.  Pl.'s Mot. at 5-6.  The FBI has not responded to this point.  Accordingly, summary judgment will

be denied to the FBI without prejudice.[13]

### B.  Documents More Than 25 Years Old

Mr. Wheeler makes his strongest objection to the FBI's failure to release documents that are more than 25 years old.  He notes that Executive Order 12,958 provides for automatic declassification of information that is more than 25 years old, although he acknowledges that the FBI is exempt from this requirement.  However, Mr. Wheeler asserts that "[i]n return for this exemption, the FBI agreed that it would establish a mechanism for dealing with the declassification of records of historical importance."  Pl.'s Mot. at 7.  To make this argument, Mr. Wheeler relies on an October 12, 1995 memorandum, issued by former Attorney General Janet Reno, that stated that "the FBI will establish an additional team of analysts to systematically review and declassify information determined to be of historical interest."  *Id.*  Mr. Wheeler argues that the FBI must refer the withheld records to this team of analysts for review and release unless such release "will cause substantial harm."  Pl.'s Mot. at 8 (emphasis omitted).

To the contrary, the FBI clearly applied the procedures required under the relevant version of E.O. 12,958, as amended on March 25, 2003.  *See* 2nd Keeley Decl. at ¶ 30.  Attorney General Reno's 1995 memorandum is no longer the applicable document or standard.

In the alternative, Mr. Wheeler challenges the FBI's adherence to E.O. 12,958.  Mr. Wheeler notes that, pursuant to that Executive Order, information can be withheld when its

---

[13]  In his initial motion for summary judgment, Mr. Wheeler criticized the FBI for deleting a paragraph from one document because it "is outside the scope of this request."  Pl.'s Mot. at 6; *see* 2nd Keeley Decl., Ex. B, WHEELER-79-FBIHQ.  He now acknowledges that he misread the document.  In addition, the FBI has now produced a second copy of WHEELER-32-FBIHQ because Mr. Wheeler complained that the first copy released to him was so overexposed that it was illegible.  Pl.'s Mot. at 6; Reply to Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Reply") at 5.

disclosure "reasonably could be expected to cause damage to the national security that the original classification authority is able to identify or describe."   Pl.'s Mot. at 9 (citing Exec. Order No. 12,958 § 1.5(3) (emphasis omitted)).  He argues that the FBI has merely made conclusory statements that release of the withheld information would damage national security.  Relying on the D.C. Circuit's decision in *King v. U.S. Dep't of Justice*, 830 F.2d 210 (D.C. Cir. 1987), he assails the FBI's alleged failure to "explain *how* disclosure of the material in question would cause the requisite degree of harm to the national security."  Pl.'s Mot. at 8 (quoting *King*, 830 F.2d at 224) (emphasis added in Pl.'s Mot.).  He adds,

> Whether disclosure could reasonably be expected to identify sources is disputed by Wheeler except in the actual instance where the real name of the source is disclosed.  Given the age of the documents at issue and the end of the Cold War, it is not reasonable to expect that any other disclosure would result in the identification of a source.

*Id.* at 15.  "The FBI's failure to take the passage of three decades or more into account is inconsistent with E.O. 12958's emphasis on the declassification of antiquated materials stemming from the Cold War era."  *Id.* at 17.

The Court disagrees.  First, despite the passage of time, foreign relations between Cuba and the United States remain tenuous at best.  Each country remains intensely interested in obtaining and preventing the flow of information from Cuba to the U.S.  Thus, persons in Cuba who once (or now) have provided information to the United States could be in danger of embarrassment or imprisonment, if not death, if knowledge of their cooperation became known to the Cuban government.  Second, the end of the Cold War in Europe is irrelevant to conditions on this half of the globe.  Cuba remains a communist country, hostile to the United States and its interests.  Third, the Second Keeley Declaration explains that the detailed information supplied by FBI sources in

Cuba is specific in nature or of unique character; that the information pinpoints a specific time frame or a specific vantage point; that the information is such that only a few parties would have had access to it; and, therefore, that a hostile analyst could have sufficient clues to identify the contributing source and/or methods. *See* 2nd Keeley Decl. ¶ 41. Her points are demonstrated by the documents withheld by the First and Second Government Agencies, which the Court has reviewed *in camera*.

The FBI went through multiple reviews of the requested information and declassified portions of it for release. Some information, however, the FBI concluded must remain classified. The Department Review Committee at DOJ agreed with these analyses and conclusions. Under FOIA Exemption (b)(1), the FBI refused to release the identities of classified resources and/or intelligence methods. Mr. Wheeler's fundamental challenge relies only on the age of the documents. The Court finds that the FBI has adequately and sufficiently explained why time alone has not cured all risks from the release of this specific information.

### C.  Information Related to Internal Personnel Rules and Practices

The FBI withheld one source symbol number, two informant file numbers, and information concerning the distribution of copies of documents to a First Government Agency in reliance on FOIA Exemptions 2 and 7. *See id*. ¶¶ 60, 65. Mr. Wheeler challenges this reliance, arguing that FBI sources are not employees and the distribution of materials to other agencies cannot qualify as an internal personnel practice.

The FBI answers that the source symbol number is used as an administrative reporting tool within the scope of Exemption 2 that could not be "subject to . . . a genuine and significant public interest." *See Rose*, 425 U.S. at 369-70. It also argues that the release of such information would indicate the scope and location of the FBI informant, and connections of the informant to

dates, times, places, events and names that could reveal his or her identity.

"The means by which the FBI refers to informants in its investigative files is a matter of internal significance in which the public has no substantial interest." *Lesar v. U.S. Dep't of Justice*, 636 F.2d at 486. It is wholly irrelevant that informants are not considered agency employees. *See Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 763-770 (D.C. Cir. 1978) (*en banc*). Mr. Wheeler offers no evidence or argument that source symbols and informant file numbers are matters of substantial interest to the public, and the Court conceives of none. Therefore, it finds that the FBI legitimately relied on Exemption 2 to refuse to release these pieces of information.

As to Exemption 7, Mr. Wheeler argues that the FBI has not met its burden of showing that the information at issue was "'compiled for law enforcement purposes,' a threshold requirement for Exemption 7." Pl.'s Reply at 6 (quoting Def.'s Reply at 9). In context, this argument is seriously flawed. Exemption 7(D) exempts from disclosure two kinds of information: (1) the identity of a confidential source who is promised confidentiality and (2) information provided by a confidential source when that information is gathered as part of a criminal law investigation or a lawful national security intelligence investigation. 5 U.S.C. § 552(b)(7)(D). The FBI relies upon the former, stating that these confidential sources were promised confidentiality, and explains how release of the source symbol number could be used to ascertain the times, locations, and dates on which the source provided information, which could then be used to discern the identity of the source. Accordingly, the Court finds that the FBI legitimately relied on Exemption 7(D) to refuse to release the source symbol number.

Finally, the FBI relied on Exemption 2 to withhold information concerning the distribution of copies of documents to a First Government Agency. Mr. Wheeler argues that the

public has an interest in disclosure because "[i]nformation indicating that another agency has been sent a copy of an FBI document tells the public which other agencies are involved in the investigation, thereby permitting the public to inquire about and evaluate the role played by the other agency or agencies." Pl.'s Mot. at 22. This argument might give pause if there were any indication of a lack of good faith in the FBI's handling of Mr. Wheeler's FOIA request. The Court finds that there is none. This perfectly unremarkable FOIA request has been handled in the appropriate fashion, with cross-checking and review by more than one set of eyes. Mr. Wheeler might have a *personal* interest in what agencies were interested in the FBI's investigation concerning him, but that alone does not amount to a public interest. The Court finds that the FBI legitimately relied on Exemption 2 to withhold information concerning the distribution of copies of documents to a First Government Agency.

### D. Information Compiled for Law Enforcement Purposes That Could Constitute An Unwarranted Invasion of Personal Privacy

The FBI relied on Exemption 7(C) to withhold certain information challenged by Mr. Wheeler as lacking proof of any connection to a law enforcement purpose or an unwarranted invasion of personal privacy. He cites *Pratt v. Webster*, 673 F.2d 408 (D.C. Cir. 1982), for requiring two conditions that must be present in every Exemption 7 claim and that are allegedly missing here:

> First, the agency's investigatory activities that reveal the documents sought must be related to the enforcement of federal laws or to the maintenance of national security. To satisfy this requirement of a "nexus," the agency should be able to identify a particular individual or a particular incident as the object of its investigation and the connection between that individual or incident and a possible security risk or violation of federal law. . . .
>
> Second, the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least a "colorable claim" of its rationality.

*Id.* at 23 (citing *Pratt* 673 F.2d at 420-21) (emphasis omitted).

Undoubtedly, it was no surprise to Mr. Wheeler, who asked both the CIA and the FBI for documents concerning himself, that *he* was the subject of an FBI investigation. 2nd Keeley Decl. ¶ 20 ("FBIHQ file 105-HQ-165399 (WHEELER pages 1-42) concerns a trip that plaintiff took to Havana, Cuba."); *see also id.* at ¶¶ 21, 22 ("The subject of this investigation [FBI files 105-HQ-203884 and 105-HQ-241850] is plaintiff."). Thus, consistent with *Pratt*, the agency has clearly identified the particular individual who was the object of its investigation. *Id.* The FBI has also clearly stated that it "was authorized to conduct this investigation pursuant to 18 U.S.C. § 951 and E.O. 12,333 and successor orders." *Id.* at ¶¶ 20, 21, 22.[14] In other words, since Mr. Wheeler had ready access to Cuba and the United States at a time of significant tension between the governments of both countries (and was presumably not working for the CIA or FBI), the FBI investigated him to see if he were acting on behalf of the Cuban government when he visited Cuba and then returned home. The Court finds that the FBI has provided "information sufficient to support at least a 'colorable claim' of its rationality." *Pratt*, 673 F. 2d at 421. Notably, Cuba was just as suspicious and kicked Mr. Wheeler out of the country on charges that he was a CIA spy. Whether one or both countries were just plain wrong and Mr. Wheeler was indeed a neutral AP reporter who spied for no one, the Court cannot say that an FBI investigation of his access to the Cuban government was irrational.

---

[14] The statutory cite provides for a fine or imprisonment for any person, "other than a diplomatic or consular officer or attache, [who] acts in the United Stats as an agent of a foreign government without prior notification to the Attorney General . . . ." 18 U.S.C. § 951(a). E.O. 12,333 authorizes U.S. intelligence activities, specifically including "counterintelligence activities outside the United States [by the FBI] in coordination with the CIA . . . ." Exec. Order No. 12,333 § 1.14(b).

The FBI redacted information, in reliance on Exemption 7(C), that referred to persons other than Mr. Wheeler.  He challenges redactions of information he believes is not private at all, such as the fact that his former wife accompanied him on the plane flight to Mexico City after he was expelled from Havana.  However, Mr. Wheeler did not submit notarized authorizations for anyone other than himself, nor proof of death.  2nd Keeley Decl. ¶ 67.  Without those privacy waivers, information concerning third parties who are not requesters is properly withheld under Exemption 7(C) as an unwarranted invasion of that person's privacy.  *See* 5 U.S.C. § 552(b)(7)(C).

While the Court must balance the public interest with the privacy interest, it finds little of public interest here in the identities of third persons.  Mr. Wheeler argues that "[w]henever an authoritarian government expels a couple and one member of that couple is a representative of the free press, there is a great public interest in knowing all the circumstances of that expulsion."  Pl.'s Reply at 7-8.  This argument is difficult to apply to these circumstances.  Mr. Wheeler, the "representative of the free press," was expelled from Cuba and information relating to him that is otherwise not exempt under FOIA has been produced.  His former wife was apparently not a "representative of the free press" and retains her own privacy interests.  Presuming for these purposes that the public retains a great interest in the circumstances of Mr. Wheeler's expulsion from Cuba back in 1969, it is not at all clear why or how such an interest applies to third persons, such as his former wife.  The Court finds that the FBI applied Exemption 7(C) appropriately to protect the privacy interests of Mr. Wheeler's former wife.

In addition, Mr. Wheeler specifically contests withholding the identity of a third person mentioned in WHEELER p. 79.  The relevant paragraph from that page states:

On August 1, 1967, MM T-1, a Cuban exile who has been involved in

> Cuban Revolutionary activities for the past eight years, advised that the
> individual identified as [redacted] is [redacted] who came to the Miami area
> from Cuba in 1959, having been sent by the CASTRO Government to check
> on the activities of certain supporters of ex-Cuban President FULGENCIO
> BATISTA.  In early 1961, [redacted] returned to Miami as an exile . . . .

2nd Keeley Decl., Ex. B, WHEELER p. 79.  Mr. Wheeler argues that the redacted information

"relates to a significant Cuban exile engaged in political activities and thus there is a strong public

interest in disclosing information regarding him [w]hether or not he is still alive . . . ."  Pl.'s Reply

at 4.  While he does not challenge this withholding as unrelated to a legitimate investigation, Mr.

Wheeler does ask the Court to require the FBI to weigh the public interest in disclosure and to

consider whether the information has already been released "under the vast disclosures of

information about such Cuban exiles that has been made under the JFK Act," Pub. L. No. 102-526,

§ 2(b), 106 Stat. 3442 (1992) (codified at 44 U.S.C. § 2107).

It would appear from WHEELER p. 79 that the unnamed person was of investigatory

interest to the FBI.  His or her identity is protected from release by Exemption 7(C).  *Reporters*

*Comm. for Freedom of the Press*, 816 F.2d at 780; *Computer Prof'ls for Social Responsibility*, 72

F.3d at 904.  The fact that this person's identity may have been disclosed elsewhere does not

diminish his or her privacy interest in regard to WHEELER p. 79.  *See Fitzgibbon*, 911 F.2d at 768;

*Weisberg*, 745 F.2d at 1491.  Mr. Wheeler correctly notes, however, that the FBI must balance the

personal privacy interest against the public interest that would be served by disclosure.  *Albuquerque*

*Publ'g Co. v. Dep't of Justice*, 726 F. Supp. 851, 855 (D.D.C. 1989).

The public interest in disclosure under FOIA relates to allowing the citizenry to see

how their government is performing.  *Reporters Comm. for Freedom of the Press*, 489 U.S. at 773.

There "is no reasonably conceivable way in which the release of one individual's name . . . would

-23-

allow citizens to know 'what their government is up to.'" *Fitzgibbon*, 911 F.2d at 768 (quoting

*Reporters Comm. for Freedom of the Press*, 489 U.S. at 773).   Even less has Mr. Wheeler

demonstrated that the public interest is both significant and compelling.   *See Senate of Puerto Rico*,

823 F.2d at 588.   In the face of this high bar, the FBI's explanations are more than sufficient to

demonstrate that it considered, and balanced, the public interests and private interests at stake:

- Being linked with any law enforcement investigation carries with it a strong negative connotation.

- To release the identities of persons as subjects of FBI interest could subject them to harassment or embarrassment or result in undue public attention.

- To release the identities of persons who are merely mentioned in these records and of no investigatory interest to the FBI could cause unsolicited and unnecessary attention to be focused on them.

2nd Keeley Decl. ¶ 70.   Mr. Wheeler's asserted public interest arises from the assumed interest of

the public in the activities of a known Cuban exile.   However, this approach applies the wrong test.

The public interest in disclosure is determined by whether the information would inform Mr.

Wheeler or the general public about the FBI's performance of its mission to enforce federal criminal

and national security statutes and/or how the FBI actually conducts its operations and investigations.

The Court can find no such public interest in the disclosure of the redacted identity in WHEELER

p. 79.

### E.  Confidential Sources to Whom a Promise of Confidentiality was Given

Exemption 7(D), quoted above, protects the identity of a confidential source who

"furnished information on a confidential basis." 5 U.S.C. § 552(b)(7)(D).   Mr. Wheeler asserts that

the FBI has failed to muster the requisite proof that an express promise of confidentiality was made

to those sources whose identities it refuses to reveal because it has no documentary proof of such a

promise and its declarant does not state that she has personal knowledge.  The information in question is the one source symbol number and two informant file numbers.

Mr. Wheeler mis-reads Ms. Keeley's Declaration.  Ms. Keeley informs the Court that the FBI does not assign source symbol numbers to all FBI informants but only to those who have been developed, instructed, closely monitored and, in many cases, paid for their services.  2nd Keeley Decl. ¶ 76.  Such sources "report information to the FBI under an express grant of confidentiality." *Id.*  Ms. Keeley reports this information "based upon [her] personal knowledge, upon information provided to [her] in [her] official capacity, and upon conclusions and determinations reached and made in accordance therewith." *Id.* ¶ 2.  Thus, the kind of informant who receives a source symbol number is a special person, one with whom the FBI has a close relationship likely to continue over time. All informants of sufficient importance to have been developed, instructed, monitored, and possibly paid for their services have been expressly promised confidentiality, which is why they are given source symbol numbers.  All those with source symbol numbers have been developed, instructed, monitored, and possibly paid for their services under an express promise of confidentiality.  Ms. Keeley's statement that the informant behind the source symbol number received an express grant of confidentiality is, therefore, offered with sufficient knowledge.  Since the two informant file numbers are otherwise protected from disclosure under Exemption 2, *supra*, there is no need to analyze them separately under Exemption 7.

## IV.  CONCLUSION

Having carefully considered the cross motions for summary judgment, the oppositions thereto, and the entire record, the Court will GRANT the FBI's motion for summary judgment in part and DENY it in part.  The Court will DENY Mr. Wheeler's motion as moot.  The FBI's motion will

be granted as to all FOIA/PA requests except for the requests that the FBI search its "109 files" and

that it release its search worksheets, as to which summary judgment will be denied without prejudice.

A memorializing order accompanies this memorandum opinion.



_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

DATE: September 30, 2005.